UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ANTOINE ABDIAS,

                Plaintiff,

v.

MATT MACAULEY et al.,

                Defendants.

_____/

Case No. 1:24-cv-776

Honorable Ray Kent

## **OPINION**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis* in a separate order. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, Plaintiff consented to proceed in all matters in this action under the jurisdiction of a United States Magistrate Judge. (ECF No. 6.)

This case is presently before the Court for preliminary review under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court is required to conduct this initial review prior to the service of the complaint. *See In re Prison Litig. Reform Act*, 105 F.3d 1131, 1131, 1134 (6th Cir. 1997); *McGore v. Wrigglesworth*, 114 F.3d 601, 604-05 (6th Cir. 1997) (overruled on other grounds). Service of the complaint on the named defendants is of particular significance in defining a putative defendant's relationship to the proceedings.

"An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process." *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347 (1999). "Service of process, under

longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Id.* at 350. "[O]ne becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend." *Id.* (citations omitted). That is, "[u]nless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 351. Therefore, the PLRA, by requiring courts to review and even resolve a plaintiff's claims before service, creates a circumstance where there may only be one party to the proceeding—the plaintiff—at the district court level and on appeal. *See, e.g.*, *Conway v. Fayette Cnty. Gov't*, 212 F. App'x 418 (6th Cir. 2007) ("Pursuant to 28 U.S.C. § 1915A, the district court screened the complaint and dismissed it without prejudice before service was made upon any of the defendants . . . [such that] . . . only [the plaintiff] [wa]s a party to this appeal.").

Here, Plaintiff has consented to a United States Magistrate Judge conducting all proceedings in this case under 28 U.S.C. § 636(c). Section 636(c) provides that "[u]pon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings . . . and order the entry of judgment in the case . . . ." 28 U.S.C. § 636(c). Because the named Defendants have not yet been served, the undersigned concludes that they are not presently parties whose consent is required to permit the undersigned to conduct a preliminary review under the PLRA, in the same way they are not parties who will be served with or given notice of this opinion. *See Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995) ("The record does not contain a consent

from the defendants[; h]owever, because they had not been served, they were not parties to this action at the time the magistrate entered judgment.").[1]

Under the PLRA, the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim. Additionally, the Court will deny Plaintiff's motion to appoint counsel.

## Discussion

### I.    Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Alger Correctional Facility in Munising, Alger County, Michigan.[2] The events about which he complains first occurred at the Oaks Correctional Facility (ECF) in Manistee, Manistee County, Michigan. Next, the events about which he complains occurred at the Bellamy Creek Correctional Facility (IBC) in Ionia, Ionia County, Michigan, as alleged against the following IBC staff:

---

[1] *But see Coleman v. Lab. & Indus. Rev. Comm'n of Wis.*, 860 F.3d 461, 471 (7th Cir. 2017) (concluding that, when determining which parties are required to consent to proceed before a United States Magistrate Judge under 28 U.S.C. § 636(c), "context matters" and the context the United States Supreme Court considered in *Murphy Bros.* was nothing like the context of a screening dismissal pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c)); *Williams v. King*, 875 F.3d 500, 503-04 (9th Cir. 2017) (relying on Black's Law Dictionary for the definition of "parties" and not addressing *Murphy Bros.*); *Burton v. Schamp*, 25 F.4th 198, 207 n.26 (3d Cir. 2022) (premising its discussion of "the term 'parties' solely in relation to its meaning in Section 636(c)(1), and . . . not tak[ing] an opinion on the meaning of 'parties' in other contexts").

[2] *See* MDOC Offender Tracking Information System, https://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=836389 (last visited Feb. 19, 2025).

Defendants Warden Matt Macauley, Deputy Warden M. Walzack, Assistant Deputy Warden B. Hadden, Resident Unit Manager J. Buchin, Resident Unit Manager C. Battle, and Prison Counselor Houghton. Plaintiff then complains of events that occurred at the Earnest C. Brooks Correctional Facility (LRF) in Muskegon Heights, Muskegon County, Michigan, as alleged against the following LRF staff: Defendants Warden Chris King, Assistant Deputy Warden M. Martin, and Resident Unit Manager C. Boykins. Finally, Plaintiff complains of events that occurred at the St. Louis Correctional Facility (SLF) in St. Louis, Gratiot County, Michigan. In addition to the above-listed Defendants, Plaintiff also sues MDOC Manager of Grievances and Legal Affairs Richard D. Russell. Plaintiff sues each of these Defendants in their individual and official capacities. (*See* Compl., ECF No. 1, PageID.2–6.)

In Plaintiff's complaint, he alleges that on May 1, 2023, while he was incarcerated at ECF, Plaintiff's cellmate, inmate Turner, threatened to kill, or have his gang affiliates kill, Plaintiff. (*See id.*, PageID.9.) In response, Plaintiff assaulted inmate Turner and was placed in segregation. (*See id.*) In October 2023, inmate Turner was placed in segregation in the cell next to Plaintiff; Turner again threatened Plaintiff's life, including stating that he could have Plaintiff killed no matter where Plaintiff was transferred. (*See id.*)

On December 19, 2023, Plaintiff was transferred to IBC. (*Id.*, PageID.11.) Upon arrival, Plaintiff asked unspecified individuals if he could be placed in protective custody, and Plaintiff refused to go to general population, where he was assigned. (*Id.*) Plaintiff was taken to temporary segregation, and an unnamed, non-party officer issued Plaintiff a disobeying a direct order misconduct charge "for not going in the unit."[3] (*Id.*) On December 20, 2023, an unnamed prison counselor interviewed Plaintiff and, after hearing Plaintiff's concerns, stated he did not believe

---

[3] In this opinion, the Court corrects the capitalization in quotations from Plaintiff's complaint.

Plaintiff's allegations regarding inmate Turner. (*Id.*) Over the next week, Plaintiff "sent numerous prisoner kites with the [ECF Security Classification Committee (SCC)] monthly reports about the incident between Plaintiff and prisoner Turner" to unnamed "IBC Bellamy Creek officials," asking to be placed in protective custody due to the incident with inmate Turner at ECF. (*Id.*) Plaintiff sent these kites "through [Defendant] Houghton as he made his daily round[s]." (*Id.*) On January 2, 2024, Defendants Walzack and Battle, both of whom Plaintiff identifies as IBC SCC members, assigned Plaintiff back to general population at IBC. (*Id.*, PageID.12.) Plaintiff submitted a grievance regarding this placement, and on January 6 and 16, 2023, Defendants B. Hadden and J. Buchin denied Plaintiff's grievance; Plaintiff appealed these denials. (*Id.*)

Plaintiff claims that the "SCC kept denying Plaintiff's protection request" and "tried to reclassify Plaintiff to general population housing unit 5 where prisoners were waiting to stab[] and kill Plaintiff." (*Id.*) Plaintiff further claims that "[a]s a way of covering up for IBC . . . SCC members['] decisions to den[y] Plaintiff protective custody," on January 31, 2023, Defendant Buchin moved Plaintiff to an alternate Level IV housing unit "under the fabricated and falsified reason that Plaintiff had refused to lock" in his assigned unit. (*Id.*, PageID.12–13.)

Subsequently, on February 9, 2024, Plaintiff was transferred from IBC to LRF. (*Id.*, PageID.13.) On February 13, 2024, Plaintiff claims that inmate Turner, Plaintiff's cellmate at ECF, "sent 2 of his gang affiliates to come after Plaintiff," and they "were plotting to stab[] and kill [Plaintiff]," but Plaintiff "was able to rush to the officer[']s . . . unit desk" and tell non-party Officer Haskins that Plaintiff was not safe in the unit. (*Id.*) "Plaintiff asked to be take[n] to segregation," and "then Plaintiff spoke to [non-party] Sergeant Clark about the people who came after him." (*Id.*) Plaintiff was taken to segregation, and he remained there until Defendants Martin and

Boykins approved Plaintiff's request for protective custody on February 14, 2024. (*Id.*, PageID.13, 15.)

On March 1, 2024, while incarcerated at LRF, Plaintiff received a step II grievance response from Defendant Macauley, the Warden at IBC, in which Macauley agreed with the decision to deny Plaintiff protective custody and to deny the grievances, finding "no impropriety on behalf of IBC staff." (*Id.*, PageID.13.) On May 8, 2024, "[Defendant] Russell[,] manager of grievances [and] legal affairs[,] claimed that Plaintiff['s] appeal was reviewed, considered, investigated, and [a] proper decision was rendered." (*Id.*, PageID.13–14.)

On March 13, 2024, Defendants Martin and Boykins told Plaintiff he would "be transfer[r]ed to an alternate facility for protection." (*Id.*, PageID.15.) While Plaintiff was waiting to be transferred, he was housed in temporary segregation, and at an unspecified time, he "requested legal writer services because he needed legal writer services to help him file a 1983 civil complaint against . . . Alger Correctional Facility." (*Id.*) Non-party Librarian Harris approved Plaintiff's request, and on June 5, 2024, "Plaintiff was placed on the call-out to bring the paperwork associated with his 1983 civil complaint." (*Id.*) The legal writer came to pick up the paperwork on June 5, 2024, and June 8, 2024, but "the legal writer was told to go back to the library" by non-parties Sergeant Wakefield and Captain Gren "under the pretense that Plaintiff . . . was not eligible for legal writer services." (*Id.*) On June 12, 2024, Plaintiff asked Defendant Martin "to ask [Defendant] King to grant or approve [Plaintiff's request for] legal writer services." (*Id.*) On June 25, 2024, Plaintiff learned from non-party Prison Counselor Williams that Defendant King had denied Plaintiff's request for legal writer services. (*Id.*, PageID.15–16.) The next day, June 26, 2024, Plaintiff filed a grievance regarding Defendant King's denial of Plaintiff's request for legal

writer services. (*Id.*, PageID.16.) Non-party Grievance Coordinator Page claimed to have received Plaintiff's grievance on July 1, 2024, and denied the grievance as untimely. (*Id.*)

On July 2, 2024, Plaintiff was transferred to SLF and placed in a general population housing unit. (*Id.*) Plaintiff claims that this "was a way of [Defendant] King retaliating against Plaintiff['s] . . . protective custody placement by transferring Plaintiff to [SLF] . . . general population." (*Id.*) Upon arrival at SLF, Plaintiff informed non-party SLF Prison Counselor Stewart that "he was supposed to be classified to a protective custody housing unit." (*Id.*) Non-party Prison Counselor Stewart "ordered Plaintiff to go lock down." (*Id.*) Plaintiff refused to do so "because Plaintiff . . . is not safe in any MDOC general population setting because the gang members and [inmate] Turner are still after him." (*Id.*) Plaintiff was then placed in segregation, and he received a disobeying a direct order misconduct charge. (*Id.*) Plaintiff claims that he then spent "7 days in segregation wearing the same pair [of] socks, the same underwear[,] and the same pair [of] t-shirt[s] from 7-2-24 to 7-8-24 because [the SLF] property officer intentionally refused to give Plaintiff his personal and state allowable segregation propert[y]." (*Id.*, PageID.18.)

Based on the foregoing allegations, the Court construes Plaintiff's complaint to raise claims under the First, Eighth, and Fourteenth Amendments to the U.S. Constitution. As relief, Plaintiff seeks (i) an order directing these Defendants to place Plaintiff in protective custody, (ii) punitive damages in the amount of $95,000, and (iii) compensatory damages in the amount of $80,000. (*See id.*, PageID.19.)

## II.    Motion to Appoint Counsel

Plaintiff filed a motion requesting a court-appointed attorney. (ECF No. 3.) Indigent parties in civil cases have no constitutional right to a court-appointed attorney. *Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 492 (6th Cir. 1995); *Lavado v. Keohane*, 992 F.2d 601, 604–05 (6th Cir. 1993). The Court may, however, request an attorney to serve as counsel, in the Court's

discretion. *Abdur-Rahman*, 65 F.3d at 492; *Lavado*, 992 F.2d at 604–05; *see Mallard v. U.S. Dist. Ct.*, 490 U.S. 296 (1989).

Appointment of counsel is a privilege that is justified only in exceptional circumstances. In determining whether to exercise its discretion, the Court should consider the complexity of the issues, the procedural posture of the case, and Plaintiff's apparent ability to prosecute the action without the help of counsel. *See Lavado*, 992 F.2d at 606. The Court has carefully considered these factors and determines that the assistance of counsel does not appear necessary to the proper presentation of Plaintiff's position. Plaintiff's request for appointment of counsel (ECF No. 3) will be denied.

## III.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting FED.

R. C IV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A.     Official Capacity Claims

Plaintiff sues Defendants in their official and individual capacities. (Compl., ECF No. 1, PageID.2–6.) A suit against an individual in his or her official capacity is equivalent to a suit against the governmental entity; in this case, the MDOC. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). The states and their departments are immune from suit in the federal courts under the Eleventh Amendment, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1994). Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). In numerous opinions, the United States Court of Appeals for the Sixth Circuit has specifically held that the MDOC is absolutely immune from a § 1983 suit under the Eleventh Amendment. *See, e.g.*, *Harrison*, 722

F.3d at 771; *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 962 (6th Cir. 2013); *McCoy v. Michigan*, 369 F. App'x 646, 653-54 (6th Cir. 2010). Moreover, the State of Michigan (acting through the MDOC) is not a "person" who may be sued under § 1983 for money damages. *See Lapides v. Bd. of Regents*, 535 U.S. 613, 617 (2002) (citing *Will*, 491 U.S. at 66); *Harrison*, 722 F.3d at 771.

Here, Plaintiff seeks monetary damages and injunctive relief. (*See* Compl., ECF No. 1, PageID.19.) However, an official capacity defendant is absolutely immune from monetary damages. *See Will*, 491 U.S. at 71; *Turker v. Ohio Dep't of Rehab. & Corr.*, 157 F.3d 453, 456 (6th Cir. 1998). Therefore, Plaintiff may not seek monetary damages against Defendants in their official capacities, and with respect to his request for monetary damages, he fails to state a claim against Defendants in their official capacities upon which relief can be granted.

Although damages claims against official capacity defendants are properly dismissed, an official capacity action seeking injunctive or declaratory relief constitutes an exception to sovereign immunity. *See Ex Parte Young*, 209 U.S. 123, 159-60 (1908) (holding that the Eleventh Amendment immunity does not bar prospective injunctive relief against a state official). The United States Supreme Court has determined that a suit under *Ex parte Young* for prospective injunctive or declaratory relief should not be treated as an action against the state. *See Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985). Instead, the doctrine is a fiction recognizing that unconstitutional acts cannot have been authorized by the state and therefore cannot be considered done under the state's authority. *See Graham*, 473 U.S. at 167 n.14. In the present action, Plaintiff does not allege the existence of an official policy or practice, and Plaintiff's allegations relate solely to past harm. Therefore, Plaintiff does not seek relief properly characterized as prospective and cannot maintain his request for injunctive relief. *See Ladd*, 971 F.3d at 581. ‼

10

Moreover, the Sixth Circuit has held that transfer to another correctional facility moots a prisoner's injunctive and declaratory claims. *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996) (holding that a prisoner-plaintiff's claims for injunctive and declaratory relief became moot when the prisoner was transferred from the prison about which he complained); *Mowatt v. Brown*, No. 89-1955, 1990 WL 59896 (6th Cir. May 9, 1990); *Tate v. Brown*, No. 89-1944, 1990 WL 58403 (6th Cir. May 3, 1990). Here, Plaintiff is no longer confined at IBC or LRF, which is where he avers that the IBC and LRF Defendants are employed. Thus, Plaintiff cannot maintain his claims for injunctive relief against these Defendants regarding their past actions.

For these reasons, Plaintiff has failed to state a claim against Defendants in their official capacities upon which relief can be granted. Accordingly, Plaintiff's official capacity claims against Defendants will be dismissed for failure to state a claim.

### B. Defendant Russell and the IBC Defendants—Defendants Hadden, Buchin, Macauley, Houghton, Walzack, and Battle

#### 1. Claims Based on Grievance Reponses by Defendants Hadden, Buchin, Macauley, and Russell

As to Defendants Hadden, Buchin, Macauley, and Russell, Plaintiff alleges that: (i) at some point after January 2, 2023, he submitted a grievance regarding his placement in general population at IBC, and on January 6 and 16, 2023, Defendants B. Hadden and J. Buchin denied Plaintiff's grievance, which Plaintiff then appealed (Compl., ECF No. 1, PageID.12); (ii) on March 1, 2024, while incarcerated at LRF, Plaintiff received a step II grievance response from Defendant Macauley, in which Macauley agreed with the decision to deny Plaintiff protective custody and deny the grievances, finding "no impropriety on behalf of IBC staff" (*id.*, PageID.13); and (iii) on May 8, 2024, Defendant Russell "claimed that Plaintiff['s] appeal was reviewed, considered, investigated, and [a] proper decision was rendered." (*Id.*, PageID.13–14.)

To the extent that Plaintiff intended to bring a Fourteenth Amendment claim regarding his use of the grievance procedure, various courts have repeatedly held that there exists no constitutionally protected due process right to an effective prison grievance procedure. *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy*, 30 F. App'x 568, 569–70 (6th Cir. 2002); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases). And, Michigan law does not create a liberty interest in the grievance procedure. *See Olim v. Wakinekona*, 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994). Therefore, any intended procedural due process claim regarding Plaintiff's use of the grievance procedure will be dismissed.

Furthermore, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). To the extent that Plaintiff seeks to hold Defendants Hadden, Buchin, Macauley, and Russell liable due to their supervisory positions, he fails to state such a claim. Government officials, such as Defendants Hadden, Buchin, Macauley, and Russell, may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *See Grinter v. Knight*, 532 F.3d 567, 576 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002); *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).

The Sixth Circuit repeatedly has summarized the minimum required to constitute active conduct by a supervisory official:

> "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee*, 199 F.3d at 300 (emphasis added) (internal quotation marks omitted). We have interpreted this standard to mean that "at a minimum," the plaintiff must show that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

*Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (quoting *Shehee*, 199 F.3d at 300); *see also Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995)); *Walton v. City of Southfield*, 995 F.2d 1331, 1340 (6th Cir. 1993).

Here, Plaintiff fails to allege any facts showing that Defendants Hadden, Buchin, Macauley, and Russell encouraged or condoned the conduct of their subordinates, or authorized, approved, or knowingly acquiesced in the conduct. And, any conclusory allegations of supervisory responsibility are insufficient to show that these Defendants were personally involved in the alleged violations of Plaintiff's constitutional rights. *See, e.g.*, *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers*, 368 F.3d at 888.

Accordingly, Plaintiff's claims against Defendants Hadden, Buchin, Macauley, and Russell regarding their responses to Plaintiff's grievances will be dismissed for failure to state a claim. Plaintiff presents no other claims against Defendants Hadden, Macauley, and Russell, and therefore, these Defendants and all of Plaintiff's claims against them will be dismissed.

### 2.    Eighth Amendment Claims—Defendants Houghton, Walzack, Battle, and Buchin

Turning to Plaintiff's claims against Defendants Houghton, Walzack, Battle, and Buchin, Plaintiff alleges violations of his Eighth Amendment right to safety while in prison. (Compl., ECF No. 1, PageID.14.)

Inmates have a constitutionally protected right to personal safety grounded in the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Thus, prison staff are obliged "to take reasonable measures to guarantee the safety of the inmates" in their care. *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). In particular, because officials have "stripped [prisoners] of virtually every means of self-protection[,]" "officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833. However, although "prison officials have a duty [under the Eighth Amendment] to protect prisoners from violence at the hands of other prisoners," it is equally clear that not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials." *Id.* at 834 (citations and internal quotation marks omitted).

In order for a prisoner-plaintiff to state an Eighth Amendment claim, the plaintiff must allege facts indicating that, "'objectively,' he was 'incarcerated under conditions posing a substantial risk of serious harm.'" *See Reedy v. West*, 988 F.3d 907, 912 (6th Cir. 2021) (quoting *Farmer*, 511 U.S. at 834). The plaintiff must also show that "the official acted with 'deliberate indifference' to inmate safety, meaning the official was 'subjectively aware of the risk' and 'fail[ed] to take reasonable measures to abate it.'" *Id.* (quoting *Farmer*, 511 U.S. at 829, 834, 847). Deliberate indifference is a higher standard than negligence and requires that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Bishop v. Hackel*, 636 F.3d 757, 767 (6th Cir. 2011).

### a.    Defendant Houghton

Plaintiff's only allegation against Defendant Houghton is as follows: over the course of one week in December of 2023, while incarcerated at IBC, Plaintiff "sent numerous prisoner kites

14

with the [ECF Security Classification Committee (SCC)] monthly reports about the incident between Plaintiff and prisoner Turner" to unnamed "IBC Bellamy Creek officials," asking to be placed in protective custody due to the incident with inmate Turner at ECF, and Plaintiff sent these kites to unnamed "IBC Bellamy Creek officials" "through [Defendant] Houghton as he made his daily round[s],". (Compl., ECF No. 1, PageID.11.)

"[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution," *Iqbal*, 556 U.S. at 676, and a claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter*, 532 F.3d at 575–76; *Greene*, 310 F.3d at 899. Here, Plaintiff alleges only that he sent kites to unnamed "IBC Bellamy Creek officials" in late December 2023 "*through* [Defendant] Houghton as he made his daily round[s]." (Compl., ECF No. 1, PageID.11 (emphasis added).) Notably, Plaintiff does not allege that he informed Defendant Houghton about the contents of the kites. (*See id.*) Instead, Plaintiff's allegations show only that Defendant Houghton delivered Plaintiff's kites to other unnamed "IBC Bellamy Creek officials" in late December 2023. (*Id.*)

Under these circumstances, because Plaintiff does not allege that he informed Defendant Houghton about the contents of the kites, Plaintiff necessarily fails to show that Defendant Houghton knew of a substantial risk of harm to Plaintiff, let alone that Houghton knew of such a risk and disregarded it. Accordingly, Plaintiff fails to state an Eighth Amendment claim against Defendant Houghton. Plaintiff presents no other claims against Defendant Houghton, and therefore, Houghton will be dismissed from this suit.

### b.    Defendants Walzack, Battle, and Buchin

Plaintiff claims that Defendants Walzack, Battle, and Buchin failed to protect him by failing to act on Plaintiff's requests for placement in protective custody at IBC. (*See id.*, PageID.14

(stating that the IBC Defendants violated Plaintiff's Eighth Amendment rights "by their deliberate indifference to his safety").)

As an initial matter, based on the facts alleged in the complaint, it is not clear that Plaintiff has alleged sufficient facts to show that during his incarceration at IBC, "'objectively,' he was 'incarcerated under conditions posing a substantial risk of serious harm.'" *See Reedy*, 988 F.3d at 912. The core of Plaintiff's claim is that Defendants Walzack and Battle should not have assigned him to general population on January 2, 2024, and that Defendant Buchin should not have placed him in another housing unit in general population on January 31, 2024. (*See* Compl., ECF No. 1, PageID.12.) However, the complaint alleges no specific facts to indicate that Plaintiff was at risk of a reasonably preventable assault during his time *at IBC*. For example, there is no indication that inmate Turner, the inmate who attacked Plaintiff at ECF, was housed at IBC in January 2024, and Plaintiff provides no allegations to show that inmate Turner had associates at IBC who would carry out Turner's vague threat to kill Plaintiff no matter where Plaintiff was transferred. (*See id.*, PageID.9.) Although Plaintiff alleges in a conclusory and vague manner that he believed unspecified inmates in unit 5 "were waiting to stab[] and kill Plaintiff," he alleges no further *facts* to support his vague assertion. (*Id.*, PageID.12.) Under these circumstances, the Court concludes that Plaintiff's vague suggestion of a general fear of placement in general population at IBC is insufficient to satisfy the objective component of the relevant two-prong standard. *But see Hamilton v. Eleby*, 341 F. App'x 168, 171 (6th Cir. 2009) (finding the objective element satisfied where, among other things, the plaintiff received a death threat bearing a gang's symbol, the gang had taken a hit out on him, and members of the gang had previously "broke [the plaintiff's] face" and attempted to stab him at a different prison).

Moreover, even assuming, without deciding, that the objective component is met, the complaint lacks facts to indicate that Defendants Walzack, Battle, and Buchin knew of a substantial risk of harm to Plaintiff, let alone that they knew of the risk and disregarded it. Specifically, Plaintiff alleges only that he "sent numerous prisoner kites with the [ECF SCC] monthly reports about the incident between Plaintiff and prisoner Turner" to unnamed "IBC Bellamy Creek officials," asking to be placed in protective custody due to the incident with inmate Turner at ECF (Compl., ECF No. 1, PageID.11); but, Plaintiff does not identify the "IBC Bellamy Creek officials" to whom he sent these kites, and he alleges no further facts to suggest that he informed Defendants of his concerns. "Summary reference to a single, five-headed 'Defendants' [or officials] does not support a reasonable inference that each Defendant is liable . . . ." *Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019) (citing *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011)). Under these circumstances, Plaintiff fails to show that Defendants Walzack, Battle, and Buchin were "'subjectively aware of the risk' and 'fail[ed] to take reasonable measures to abate it.'" *Reedy*, 988 F.3d at 912 (quoting *Farmer*, 511 U.S. at 829, 834, 847).

Accordingly, for the reasons set forth above, Plaintiff's Eighth Amendment claims against Defendants Walzack, Battle, and Buchin will be dismissed.

### c.       "Gang Affiliates" at LRF

Additionally, generously construing Plaintiff's complaint, as the Court is required to do at this stage of the proceedings, the Court construes Plaintiff's complaint to raise an Eighth Amendment failure to protect claim against the IBC Defendants regarding Plaintiff's interaction with "gang affiliates" at LRF. (*See* Compl., ECF No. 1, PageID.14 (stating that "had IBC administration officials decided to place him in protective custody when he requested it . . . Plaintiff asserts [that inmate] Turner[,] the prisoner he was seeking protection from[,] would never

17

ever [have] been able to send his people[,] his gang affiliates[,] to come after Plaintiff on 2-13-24 at [LRF]").)

As relevant to this claim, Plaintiff alleges that on February 9, 2024, he was transferred from IBC to LRF, and on February 13, 2024, inmate Turner, Plaintiff's cellmate at ECF, "sent 2 of his gang affiliates to come after Plaintiff," and they "were plotting to stab[] and kill [Plaintiff]," but Plaintiff "was able to rush to the officer[']s . . . unit desk" and tell non-party Officer Haskins that Plaintiff was not safe in the unit. (*Id.*, PageID.13.) "Plaintiff asked to be take[n] to segregation," and he remained there until Defendants Martin and Boykins approved Plaintiff's request for protective custody on February 14, 2024. (*Id.*, PageID.13, 15.)

As an initial matter, Plaintiff does not allege any *facts* to show that the IBC Defendants had any personal involvement in Plaintiff's incarceration and housing unit placement at LRF. Moreover, even if Plaintiff could show that any of the IBC Defendants were responsible for Plaintiff's placement in general population at LRF (which he cannot), Plaintiff fails to allege any facts to show the IBC Defendants knew of a substantial risk of harm to Plaintiff at LRF. Specifically, Plaintiff fails to allege any facts to suggest that he informed the IBC Defendants of a risk of harm to Plaintiff at LRF. Liberally construing Plaintiff's complaint, it appears that Plaintiff believes he is not safe at any MDOC correctional facility, or at least in general population at any MDOC correctional facility, however, Plaintiff fails to allege any facts to suggest that the IBC Defendants knew about Plaintiff's fear of placement in general population at all MDOC facilities.

Accordingly, for these reasons, Plaintiff fails to show that any of the IBC Defendants knew of a substantial risk of harm to Plaintiff in general population at LRF, let alone that they knew of this risk and disregarded it. Therefore, Plaintiff's Eighth Amendment failure to protect claims

against the IBC Defendants regarding Plaintiff's interaction with "gang affiliates" at LRF will be dismissed for failure to state a claim.

### 3.    First Amendment Claim—Defendant Buchin

Finally, the Court also generously construes Plaintiff's complaint to raise a First Amendment retaliation claim against Defendant Buchin, alleging that on January 31, 2023, Defendant Buchin moved Plaintiff to an alternate Level IV housing unit at IBC "under the fabricated and falsified reason that Plaintiff had refused to lock" in his assigned unit. (*Id.*, PageID.12–13.)

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to show that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Even assuming, without deciding, that Plaintiff engaged in protected conduct before Defendant Buchin transferred Plaintiff to an alternate Level IV housing unit on January 31, 2023, Plaintiff's retaliation claim fails at the second and third steps. As an initial matter, typically, transfers to the general population of another prison or between general population units at one prison are not an adverse action. *See Smith v. Yarrow*, 78 F. App'x 529, 543 (6th Cir. 2003) (collecting cases). However, in *Hill v. Lappin*, the Sixth Circuit held that transfer from general

population to administrative segregation or another prison's lock-down unit can be sufficient to constitute adverse action. *Hill*, 630 F.3d at 474–75.

Here, Plaintiff alleges no facts to suggest his transfer to an alternate level IV unit constituted an adverse action because he alleges no facts to suggest this transfer was anything other than a transfer to a different, but otherwise essentially identical, housing unit at IBC. And, even assuming, without deciding, that this transfer was an adverse action, Plaintiff fails to allege any facts to suggest that Defendant Buchin acted with a retaliatory motive. Moreover, although Plaintiff claims that Defendant Buchin transferred him to another unit at IBC "under the fabricated and falsified reason that Plaintiff had refused to lock" in his assigned unit, Plaintiff's factual allegations show that he had in fact refused to lock in his assigned unit at IBC. (*See* Compl., ECF No. 1, PageID.11.) Under these circumstances, Plaintiff fails to show that Defendant Buchin was motivated by any protected conduct when Buchin transferred Plaintiff to an alternate Level IV housing unit at IBC.

Accordingly, for all of these reasons, Plaintiff fails to state a First Amendment retaliation claim against Defendant Buchin.

### C.    LRF Defendants—Defendants King, Martin, and Boykins

#### 1.    First Amendment Retaliation Claims

As to the LRF Defendants, the Court first construes Plaintiff's complaint to raise First Amendment retaliation claims against Defendants King, Martin, and Boykins. (*See, e.g.*, *id.*, PageID.14 (claiming that Defendant King retaliated against him).)

##### a.    Protected Conduct

With respect to the first element of a First Amendment retaliation claim, an inmate has a right to file "non-frivolous" grievances against prison officials on his own behalf, whether written or oral. *Maben v. Thelen*, 887 F.3d 252, 265 (6th Cir. 2018); *Mack v. Warden Loretto FCI*, 839

F.3d 286, 298–99 (3d Cir. 2016). Here, Plaintiff references filing at least one grievance during his incarceration at LRF. (Compl., ECF No. 1, PageID.17.) At this stage of the proceedings, Plaintiff has alleged sufficient facts to suggest that he engaged in protected conduct for purposes of his First Amendment claim.

### b.      Adverse Action and Retaliatory Motive

To establish the second element of a retaliation claim, a prisoner-plaintiff must show adverse action by a prison official sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *Thaddeus-X*, 175 F.3d at 396. The adverseness inquiry is an objective one and does not depend on how a particular plaintiff reacted. The relevant question is whether the defendant's conduct is "*capable* of deterring a person of ordinary firmness"; the plaintiff need not show actual deterrence. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002). Finally, to satisfy the third element of a retaliation claim, Plaintiff must allege facts that support an inference that the alleged adverse action was motivated by the protected conduct.

### (1)      Denial of Legal Writer Services

Here, Plaintiff alleges that despite initially receiving approval by non-party Librarian Harris for legal writer services at LRF, when the legal writer came to pick up the paperwork on June 5, 2024, and June 8, 2024, "the legal writer was told to go back to the library" by non-parties Sergeant Wakefield and Captain Gren "under the pretense that Plaintiff . . . was not eligible for legal writer services." (Compl., ECF No. 1, PageID.15.) Subsequently, on June 12, 2024, Plaintiff asked Defendant Martin "to ask [Defendant] King to grant or approve [Plaintiff's request for] legal writer services." (*Id.*) On June 25, 2024, Plaintiff learned that Defendant King had denied his request for legal writer services, and the next day, June 26, 2024, Plaintiff filed a grievance

regarding Defendant King's denial of Plaintiff's request for legal writer services. (*Id.*, PageID.15–16.)

Even assuming, without deciding, that the denial of legal writer services constitutes an adverse action, Plaintiff's retaliation claims fails at the third step because he fails to allege any facts showing that he engaged in protected conduct prior to Defendant King's denial of Plaintiff's request for legal writer services. Instead, Plaintiff alleges that he filed a grievance *after* Defendant King denied Plaintiff's request for legal writer services. (*Id.* (alleging that on June 25, 2024, Plaintiff learned that Defendant King had denied his request for legal writer services, and the next day, June 26, 2024, Plaintiff filed a grievance regarding this denial).)

Therefore, Plaintiff necessarily fails to show that the denial of his request for legal writer services was motivated by any protected conduct, and Plaintiff's First Amendment retaliation claim regarding the denial of his request for legal writer services will be dismissed for failure to state a claim.

### (2)    Transfer to General Population at SLF

As relevant to Plaintiff's retaliation claim regarding his transfer to SLF, he alleges that on March 13, 2024, when he was incarcerated at LRF, Defendants Martin and Boykins told Plaintiff he would "be transfer[r]ed to an alternate facility for protection." (*Id.*, PageID.15.) While Plaintiff was waiting to be transferred, he was housed in temporary segregation, and at an unspecified time, he "requested legal writer services." (*Id.*) This request was subsequently denied by Defendant King, and on June 26, 2024, Plaintiff filed a grievance regarding Defendant King's denial of Plaintiff's request for legal writer services. (*Id.*, PageID.16.) Non-party Grievance Coordinator Page claimed to have received Plaintiff's grievance on July 1, 2024, and denied the grievance as untimely. (*Id.*) Thereafter, on July 2, 2024, Plaintiff was transferred to SLF and placed in a general

population housing unit. (*Id.*) Plaintiff claims that this "was a way of [Defendant] King retaliating against Plaintiff['s] . . . protective custody placement by transferring Plaintiff to [SLF] . . . general population." (*Id.*)

As discussed above, typically, transfers to the general population of another prison are not an adverse action, *see Smith*, 78 F. App'x at 543, but a transfer from general population to administrative segregation or another prison's lock-down unit can be sufficient to constitute adverse action. *Hill*, 630 F.3d at 474–75. In this action, it is clear that Plaintiff did not want to be placed in general population due to his belief that general population "is not safe in any MDOC general population setting because the gang members and [inmate] Turner are still after him." (Compl., ECF No. 1, PageID.16.) The adverseness inquiry is an objective one and does not depend on how a particular plaintiff reacted. *See Thaddeus-X*, 175 F.3d at 396. Here, Plaintiff has a fear of placement in general population at any MDOC facility; however, it is not at all clear that this personal fear is sufficient to transform conduct that would otherwise not be considered adverse into conduct that constitutes adverse action for purposes of a First Amendment retaliation claim.

Regardless, even assuming, without deciding, that Plaintiff's transfer to SLF constituted adverse action, at most, Plaintiff's allegations suggest only temporal proximity between Plaintiff's transfer and Plaintiff's protected conduct. However, although, temporal proximity "may be 'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive,'" the Sixth Circuit has been reluctant to find that temporal proximity between the filing of a grievance and an official's adverse conduct, standing alone, is sufficient to establish a retaliation claim. *Compare Muhammad v. Close*, 379 F.3d 413, 417–18 (6th Cir. 2004) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004)), *and Briggs v. Westcomb*, No. 19-1837 (6th Cir. Mar. 10, 2020) (unpublished) (holding that allegations of

temporal proximity were sufficient where the filing of retaliatory misconduct by correctional officers occurred six days after Plaintiff filed a grievance against a medical provider, but only one day after the provider learned of the grievance), *with Hill*, 630 F.3d at 476 (discussing that the Sixth Circuit has been reluctant to find that temporal proximity alone shows a retaliatory motive).

Instead, Plaintiff's allegations of retaliation regarding his transfer to SLF are entirely conclusory, and Plaintiff merely alleges the ultimate fact of retaliation without providing any supporting facts. Indeed, although Plaintiff alleges in a conclusory manner that his transfer to SLF "was a way of [Defendant] King retaliating against Plaintiff['s] . . . protective custody placement by transferring Plaintiff to [SLF] . . . general population," Plaintiff's own allegations show that on March 13, 2024, prior to Plaintiff engaging in protected conduct by filing his June 26, 2024, grievance against Defendant King, Defendants Martin and Boykins had told Plaintiff that he would "be transfer[r]ed to an alternate facility for protection." (Compl., ECF No. 1, PageID.15.) Ultimately, this transfer occurred on July 2, 2024, and in the interim, Plaintiff had filed a grievance against Defendant King; however, Plaintiff's factual allegations show that there was a plan to transfer Plaintiff away from LRF for his protection *prior to* Plaintiff filing a grievance against Defendant King. Under these circumstances, Plaintiff's "conclusory allegations of retaliatory motive," which are "unsupported by material facts," do not state a claim under § 1983. *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (citation omitted); *see Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003) (holding that in complaints screened pursuant to 28 U.S.C. § 1915A, "[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial" (internal quotation marks omitted)); *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001) ("[B]are allegations of malice on the defendants' parts are

24

not enough to establish retaliation claims [that will survive § 1915A screening]." (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998))).

Therefore, any First Amendment retaliation claim premised on Plaintiff's transfer to SLF will be dismissed for failure to state a claim.

### 2.    Access to the Courts Claims

Plaintiff claims that while incarcerated at LRF, he was initially approved for "legal writer services," which he wanted to have "help him file a 1983 civil complaint against . . . Alger Correctional Facility"; however, when the legal writer came to pick up the paperwork on June 5, 2024, and June 8, 2024, "the legal writer was told to go back to the library" by two non-party officers "under the pretense that Plaintiff . . . was not eligible for legal writer services." (Compl., ECF No. 1, PageID.15.) Plaintiff then asked Defendant Martin "to ask [Defendant] King to grant or approve [Plaintiff's request for] legal writer services." (*Id.*) On June 25, 2024, Plaintiff learned that Defendant King had denied Plaintiff's request for legal writer services. (*Id.*, PageID.15–16.) The Court construes Plaintiff's allegations regarding the denial of his request for legal writer services to raise a claim regarding his right to access the courts under the First and Fourteenth Amendments.

It is clearly established that prisoners have a constitutionally protected right of access to the courts under the First and Fourteenth Amendments. *See Lewis v. Casey*, 518 U.S. 343, 354 (1996); *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). In order to state a viable claim for interference with his access to the courts, a plaintiff must show actual injury to pending or contemplated litigation. *See Lewis*, 518 U.S. at 349; *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001); *Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999). The Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts

frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. at 353 & n.3). "Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Id.*

In other words, a plaintiff must plead and demonstrate that the shortcomings in the prison legal assistance program or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a non-frivolous legal claim. *Lewis*, 518 U.S. at 351–53; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996). The United States Supreme Court has strictly limited the types of cases for which there may be an actual injury:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis*, 518 U.S. at 355. "Thus, a prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only." *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999) (en banc). Moreover, the underlying action must have asserted a non-frivolous claim. *Lewis*, 518 U.S. at 353; *accord Hadix v. Johnson*, 182 F.3d 400, 405 (6th Cir. 1999) (discussing that *Lewis* changed actual injury to include requirement that action be non-frivolous).

Here, Plaintiff alleges that he wanted to have "legal writer services" at LRF "help him file a 1983 civil complaint against . . . Alger Correctional Facility." (Compl., ECF No. 1, PageID.15.) Plaintiff provides no further facts about this civil action. Assuming, without deciding, that Plaintiff has identified an underlying cause of action for which he may bring an access to the courts claim, Plaintiff fails to allege any *facts* showing that his lack of access to "legal writer services" at LRF

26

resulted in any lost remedy in the underlying action.[4] *See Harbin-Bey*, 420 F.3d at 578 ("Examples of actual prejudice to pending or contemplated litigation include having a case dismissed, being unable to file a complaint, and missing a court-imposed deadline." (citing *Jackson v. Gill*, 92 F. App'x 171, 173 (6th Cir. 2004))).

Because Plaintiff has failed to show any lost remedy, he has failed to state a claim for denial of access to the courts. Accordingly, for the reasons set forth above, Plaintiff's access to the courts claim will be dismissed.

### 3.    Eighth Amendment Claims

The Court also construes Plaintiff's complaint to raise Eighth Amendment failure to protect claims against Defendants King, Martin, and Boykins. As set forth above, to state a claim under the Eighth Amendment based on a failure to prevent harm to a prisoner, a plaintiff must show that the prison official acted with "deliberate indifference" to a substantial risk of serious harm facing the plaintiff. *Farmer*, 511 U.S. at 834.

In this action, Plaintiff alleges that on February 9, 2024, he was transferred from IBC to LRF. (Compl., ECF No. 1, PageID.13.) On February 13, 2024, Plaintiff claims that inmate Turner, Plaintiff's cellmate at ECF, "sent 2 of his gang affiliates to come after Plaintiff," and they "were plotting to stab[] and kill [Plaintiff]," but Plaintiff "was able to rush to the officer[']s . . . unit desk" and tell non-party Officer Haskins that Plaintiff was not safe in the unit. (*Id.*) Plaintiff was taken to segregation, and he remained there until Defendants Martin and Boykins approved Plaintiff's request for protective custody on February 14, 2024. (*Id.*, PageID.13, 15.) On March 13, 2024,

---

[4] The Court notes that in July of 2024, Plaintiff filed a § 1983 action in this Court against three correctional officials at Alger Correctional Facility. *See* Compl., *Abdias v. Bauman*, No. 2:24-cv-110 (W.D. Mich. July 5, 2024), (ECF No. 1). The return address on the envelope in which he mailed his complaint indicates that Plaintiff was incarcerated at LRF when he filed the action. *See id.*, (ECF No. 1, PageID.17).

Defendants Martin and Boykins told Plaintiff he would "be transfer[r]ed to an alternate facility for protection," and on July 2, 2024, Plaintiff was transferred to SLF and placed in a general population housing unit. (*Id.*, PageID.15.) Plaintiff faults Defendant King for "transferring Plaintiff to [SLF] . . . general population." (*Id.*, PageID.16.) Plaintiff claims that at SLF, he spent "7 days in segregation wearing the same pair [of] socks, the same underwear[,] and the same pair [of] t-shirt[s] from 7-2-24 to 7-8-24 because [the SLF] property officer intentionally refused to give Plaintiff his personal and state allowable segregation propert[y]." (*Id.*, PageID.18.)

As an initial matter, Plaintiff alleges no facts to suggest that upon his arrival at LRF, he informed anyone, let alone Defendants, that he faced any risk of harm from inmate Turner or his affiliates at LRF. (*See id.*, PageID.13.) And, Plaintiff alleges that after the incident with the other two inmates, Defendants Martin and Boykins approved Plaintiff's request for protective custody and that they subsequently informed him that he would "be transfer[r]ed to an alternate facility for protection." (*Id.*, PageID.13, 15.) Rather than showing that Defendants acted with deliberate indifference to a substantial risk of harm to Plaintiff at LRF, these factual allegations, show that the LRF Defendants were responsive to Plaintiff's concerns regarding a risk of harm to him at LRF and took steps to prevent such harm from occurring.

When Plaintiff was transferred from LRF to SLF, he alleges that he was placed in general population at SLF. (*See id.*, PageID.16.) Plaintiff faults Defendant King, the Warden at LRF, for Plaintiff's placement at SLF; however, Plaintiff does not allege any *facts* to show that Defendant King had any personal involvement in Plaintiff's incarceration and housing unit placement at SLF. Moreover, even if Plaintiff could show that Defendant King or any of the other LRF Defendants were responsible for Plaintiff's placement in general population at SLF (which he cannot), Plaintiff fails to allege any facts to show that Defendant King or any of the other LRF Defendants knew of

a substantial risk of harm to Plaintiff in general population at SLF. Although Plaintiff alleges in a conclusory manner that he "is not safe in any MDOC general population setting because the gang members and [inmate] Turner are still after him," Plaintiff does not allege any facts to support this conclusory assertion and, regardless, he fails to allege any facts to suggest that the LRF Defendants knew about Plaintiff's fear of placement in general population at all MDOC facilities. Under these circumstances, Plaintiff fails to show that any Defendants knew of a substantial risk of harm to him in general population at SLF, let alone that they knew of this risk and disregarded it.

Finally, as to Plaintiff's allegation that at SLF, he spent "7 days in segregation wearing the same pair [of] socks, the same underwear[,] and the same pair [of] t-shirt[s] from 7-2-24 to 7-8-24," even assuming, without deciding, that these conditions satisfy the objective component of an Eighth Amendment claim, Plaintiff fails to allege any facts to show that the LRF Defendants had any involvement in Plaintiff's specific conditions of confinement at SLF. Indeed, Plaintiff alleges that he was limited to this amount of clothing "because [the SLF] property officer," not any of the named Defendants, "intentionally refused to give Plaintiff his personal and state allowable segregation propert[y]." (*Id.*, PageID.18.)

Accordingly, for all of the reasons set forth above, Plaintiff fails to state any Eighth Amendment claims against Defendants King, Martin, and Boykins.

## Conclusion

For the foregoing reasons, Plaintiff's motion to appoint counsel (ECF No. 3) will be denied. Further, having conducted the review required by the PLRA, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore*, 114 F.3d at 611. Although the Court

concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $605.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610–11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $605.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

An order and judgment consistent with this opinion will be entered.


Dated:    February 24, 2025                    /s/ Ray Kent
                                               Ray Kent
                                               United States Magistrate Judge